MARK REICHEL, State Bar #155034
455 CAPITOL MALL, 8th FLOOR, Suite 802
Sacramento, California  95814
Telephone: (916) 498-9258
FAX:       (888) 505-9331
www.reichellaw.com

Attorney for Defendant
SCOTT CARPER

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 20-CR-00834 CAB |
| Plaintiff, | **DEFENSE SENTENCING MEMORANDUM** |
| v. | |
| | Date: August 26, 2022 |
| | Time: 9:00 a.m. |
| SCOTT CARPER | Judge: HONORABLE CATHY ANN BENCIVENGO |
| Defendant. | |

## INTRODUCTION

Defendant SCOTT CARPER (hereafter "Scott") submits his Sentencing Memorandum requesting a sentence within the guideline range (0-6 months) for his conviction prior to the upward departure suggested in the Probation Report (hereafter "PSR.") Governing law does not allow the close to ten fold upward departure increase, and the totality of the circumstances regarding Scott[1] compel the sentence urged by Scott.

---

[1] A detailed letter to the Court from Scott will be provided shortly after this Sentencing Memorandum is filed which addresses areas relevant for the request.

Brief Factual Background. The undisputed facts now before the Court at sentencing are that Scott was convicted following trial on a more serious criminal matter, with the verdict and potential sentence then "placed on hold" to allow Scott to plead guilty to the new and different charge of False Statement in violation of 18 USC 1001. This occurred as there was alleged to be misconduct by the plaintiff on a matter of importance in the trial likely sufficient enough to raise concerns about the verdict being set aside and a new trial thereafter, without the alleged misconduct. It is understandably disputed by the parties whether a different verdict would occur at the new trial. The government will now dismiss with prejudice the original charges at the conclusion of this sentencing.

The Guidelines in the PSR: 0-6 Months. The United States Sentencing Guidelines are correctly calculated in the PSR and arrive at a final adjusted offense level of 4. (Page 7, paragraph 32). The Guideline Range is 0-6 months.

## SENTENCING MEMORANDUM

As this Honorable Court knows well, virtually anything at all, post *Booker*, is a valid issue for the court to consider when imposing a sentence. The Sentencing Reform Act, 18 U.S.C. §3551 et seq.,imposes an "overarching instruction" that district courts must select a sentence "sufficient but not greater than necessary" to achieve the sentencing goals in section 3553(a)(2). *Kimbrough v. United States*, 128 S. Ct.558, 570 (2007). They comprise "a tapestry of factors, through which runs an overarching principle," the court's duty "construct a

sentence that is minimally sufficient to achieve the broad goals of sentencing." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008). Section 3553 also requires judges to consider the types of sentences available by statute including "sentences other than imprisonment," such as probation. See *United State v Gall*, 552 U.S. 38, 128 S. Ct. 586, at 595-596 and n.4, 602 (2007) (probationary sentence reflected consideration of types of sentence available, and discussing probation as substantial restriction on freedom based on conditions of supervision). The Supreme Court envisions that a district court will always consider arguments that the Guideline sentence should not apply because the guideline itself fails properly to reflect Section 3553(a) considerations, reflects an unsound judgment, does not treat defendant characteristics in the proper way, or that a different sentence is appropriate regardless. *Rita v. United States* 551 U.S. 338, 127 S. Ct 2456 at 2468 (2007). Along with this, the Court places nothing off-limits for district courts. All the Guidelines are advisory and a judge may determine that any within Guidelines sentence is "greater than necessary" to serve the objectives of sentencing. *Kimbrough* at 564.

### A. The Sentence Should Not Be the Upward Departure From the PSR.

The PSR takes a level 4 Category II 0-6 months range and then recommends an almost ten-fold increase. The bottom of the USSG are 0 months in custody; an increase to 40 months is obviously "forty times" and a sentence of the top of the USSG,

3

6 months, is almost "seven times." Such a sentence would, as applied, violate Scott's Sixth Amendment Right to a jury trial before punishment. Further legal analysis compels this conclusion.

*Acquitted Conduct Bill (H.R. 1621) passed by 2022 Congress.* The defendant plead guilty to one count only, a false statement to a federal officer, stating that the illegal narcotic pills he had in his vehicle were for his mother when in fact they were for him. Any case law prior to the current Session of Congress on the issue of 5K2.21 needs to be evaluated through the lens of the Sixth Amendment, based upon H.R. 1621, short title "Prohibiting Punishment of Acquitted Conduct Act of 2021" and full title "To amend section 3661 of title 18, United States Code, to prohibit the consideration of acquitted conduct at sentencing." The bill has been passed in the House and is on calendar for vote in the Senate, undoubtedly expected to pass and be signed into law. The change in the law will prevent federal courts from considering acquittals when sentencing. The author, Cohen (D. Tenn) said the bill "would ensure that no one spends time in jail for conduct prosecutors were not able to prove at trial." The vote, on March 28, 2022 was 405 yeas to 12 nays. It is in the U.S. Senate and will pass and be signed into law.

If the prosecution can charge someone, and not meet their burden of proof beyond a reasonable doubt and then not be able to therefore increase a sentence, then it certainly can't do the same where it is *dismissed conduct*.

4

Such a rule is consistent with other district courts such as *United States v. Cameron*, 2014 U.S. Dist. LEXIS 148418 (2014):

> "Even though the Court has concluded that it has authority to consider conduct underlying the vacated counts in fashioning a sentence in this case, it will not do so..." *Id* at p. 16.

There the district court found it "fundamentally unfair that this Defendant's sentence should be enhanced based on conduct underlying counts that the First Circuit vacated and the Government later conceded it cannot prove at trial." *Id* at p. 18. "…But here, by pursuing his appeal, Mr. Cameron vindicated his constitutional rights. The Court accords Mr. Cameron the fruit of his appellate victory…" *Id*. at p. 21.[2]

Here, a departure as sought under § 5K2.21, especially in light of H.R. 1621, does not have a sufficient relationship between the charged and uncharged offense. The historical notes to § 5K2.21 favorably reference a number of cases where circuit courts held that an upward departure was only permissible if there was a relationship between the uncharged and charged offenses. *See United States v. Kim*, 896 F.2d 678, 682-84 (2d Cir. 1990); *United States v. Baird*, 109 F.3d 856, 865 (3d Cir. 1997); *United States v. Cross*, 121 F.3d 234, 239 (6th Cir.

---

[2] The soon to be codification of not being able to use acquitted conduct at sentencing accords with frequent Supreme Court dissents from the practice, asserting to allow such violated the Sixth Amendment. See dissent in *United States v. Jones*, 744 F.3d 1362 (D.C. Cir. 2014) *cert. denied*, 574 U.S.  , 135 S.Ct. 8,  2014 U.S. LEXIS 6736 (2014)'t]his has gone on long enough,' urging their fellow Justices to 'put an end to the unbroken string of cases disregarding the Sixth Amendment..'" Id.

5

1997). And, since the adoption of § 5K2.21, the majority of other circuits appear to require the existence of some connection between uncharged conduct and the offense of conviction. *See United States v. Ellis*, 419 F.3d 1189, 1193 (11th Cir. 2005) (finding that the defendant could not be subject to upward departure for witness tampering and suspected civil rights violations where guilty pleas was for making false statement to FBI); *United States v. Smith*, 347 U.S. App. D.C. 392, 267 F.3d 1154, 1164 (D.C. Cir. 2001) ("[T]he conduct forming the basis for the departure must be descriptively or logically, and not merely temporally, connected to the crime for which the defendant was actually convicted.").

In *Ellis*, a local prosecutor was charged with 3 counts of civil rights violations and witness tampering for his sexual affair with a criminal defendant and attempting to keep her from cooperating with the FBI about their investigation of him; he later plead guilty to a false statement to the FBI in connection with those crimes. *Id* at p. 1190-1191. The clear command was that the upward departure was not warranted.

> A departure under guideline subpart 5K2 may be based on 'conduct underlying a charge dismissed as part of a plea agreement, 'but only to the extent necessary to reflect the actual seriousness of the offense.' U.S.S.G. § 5K2.21 That is, such conduct provides a basis for departure only if it sheds further light on the *true nature of the offense of conviction*. An upward departure based on Ellis's conduct toward Manning and his subsequent indictment would do nothing to reflect the 'actual seriousness' of the offense to which he pled guilty; rather, it would reflect the seriousness of unproven allegations that, at least for sentencing purposes, are not meaningfully related to his false statement to the FBI.

*Id* at p. 1193. (Emphasis in original.)   The court themselves

6

emphasized "*on the true nature of the offense of conviction*.

Without a re trial, a re trial that would be without the alleged errors that occurred, there can be no certainty in anyone's mind as to the outcome of the trial. It would violate due process to have a sentence based upon such uncertainty.

Scott points the Court to the position that, if he had been convicted on the original charge, the Court can factor in and reduce the sentence for a lack of proof that he had any idea what or the amount of the controlled substance alleged to be imported. Such factors are a common requested downward departure under *United States v. Mendoza*, 121 F.3d 510 (9th Cir. 1997), or for a variance on similar grounds. In *Mendoza*, this Circuit instructed that, when the facts indicate that the defendant "had no control over, or knowledge of, the purity of the [drugs] that he [or she] delivered," a district court has authority to depart downwards on the ground that the drug-quantity-based Guidelines offense level "grossly overstates the culpability of the defendant's conduct." *Id*. at 513-14.

As well, our Circuit has just instructed that district courts must take into account all circumstances for requests for a minor role reduction in a strikingly similar case as the present case. *US v. Rodriguez*, No. 21-50108 (8-17-22)(M. Smith w/Bade; concurrence by VanDyke). The case was remanded for re sentencing. In sentencing for importation, the court must recognize the comparison is with an average participant in a particular conspiracy or enterprise; must consider a recruiter's culpability in luring the defendant; must consider

the degree of involvement in the factors; and look at the totality of circumstances. Upon re sentencing, as to certain factors, the Ninth Circuit instructed the court to focus on the scope of defendant's knowledge of the entire criminal enterprise (which was limited); the fact he was paid a discrete amount rather than a percentage; and the receiving of instructions does not mean one plans or organizations conduct.

    Finally, such an upward departure in this instance would render the compulsory protections and guarantees of due process required by the Ninth Circuit virtually worthless. The law on "enhancements," as taught by the Ninth Circuit, requires that the "party" seeking to enhance a sentence bears the burden of persuasion, with real evidence; *United States v. Snipe*, 515 F.3d 947 (9th Cir 2008); *United States v. Howard*, 849 F.2d 1045 (9th Cir. 1990); *United States v. Joetzki*, 952 F.2d 1090 (9th Cir. 1991). When a defendant raises objections to the enhancement the *Government* bears the burden of proof to establish the factual predicate for the court's determination. *Snipe* at 955. Further, the enhancement must be proven by clear and convincing evidence by the Government. The Ninth Circuit's established rule is that guidelines enhancements that turn out to have a disproportionate impact on the ultimate sentence imposed must be established by the Government by clear and convincing evidence. *United States v. Staten*, 466 F.3d 708, 720 (9th Cir. 2006). *Also see United States v. Dare*, 425 F.3d 634, 642 (9th Cir. 2005)(Accord *United States v. Hamas*, 780 F.3d 1285, 9th Cir. 2015).

Scott's position is that there is indeed no clear answer as to what a re trial would present; such a standard of a "guess" falls fatally short of these Ninth Circuit requirements.

B. <u>Unique Factors of Scott's Background Pre Offense.</u>

The PSR indeed paints a picture of Scott from an outsider's perspective. More than this superficial outward view is necessary to properly consider the appropriate sentence.

*Sexual abuse as a minor*. Scott was the victim of sexual abuse as a minor, from a trusted family friend. The trauma of such an occurrence can never be overstated; nor can it's effect on the self esteem, the psychological and emotional development and personality "mapping" that takes place in the important impressionable period in one's life. Those not such victims might never truly understand that proposition. It is never questioned but that childhood abuse is a relevant consideration for a downward departure. *US v Walter* 256 F.3d 891(9th Circuit 2001).

*Severe and permanent injuries as a teen*. After that life altering period, Scott then again suffered; this time, very rare and severe injuries in his formative years.

From the outside, Scott had an enviable upbringing. He had loving parents of financial means. At Bella Vista High School in Sacramento, he was a popular kid and a gifted athlete. As a star baseball player for Bella Vista High School in Sacramento, he had numerous offers to play collegiate baseball. At 17-years old, Scott's life changed when he suffered a serious low back injury in a motor vehicle accident. Because of the injury, his

9

baseball career ended; he was unable to ride a bicycle, run, or go up or down stairs for the next few years. These physical limitations on him during the prime of his youth and athletics was devastating for him mentally and emotionally.

Then, in 2016, he was rear ended in another auto accident which further damaged his already "beyond repair" physical condition. There, Scott was a rear-seated passenger in a Lyft when it was struck in the rear by another vehicle traveling at a high rate of speed. Scott was hospitalized for a few days, suffered a closed head injury, and experienced a serious aggravation of his low back and pelvic floor symptoms. He experienced a dramatic increase in pain and physical limitations. Not only did his use of opiate pain medication skyrocket, but soon thereafter he weighed nearly 400 lbs.

Then, over the course of the next 20 years, his low back condition deteriorated, he began to experience significant neck pain, and was diagnosed with Pelvic Floor Disorder (PFD).[3]

Attached hereto is an August 11, 2015 progress note from Dr. Kenneth Bradley, a pain management specialist. Also attached is an August 10, 2018 summary from Dr. Shahrouz Ghodsian M.D. who was Scott's primary care physician since approximately February 18, 2016. The record shows Scott was physically and psychologically suffering for many years from chronic pain, physical limitations, and intrusive symptoms connected to his conditions.

---

[3] In the face of these insurmountable challenges, Scott persevered (as evidenced by the multitude of letters submitted to the Court, and in fact graduated well from University Of California at Santa Barbara.

10

As for the chronic pain in the low back and neck, attached is the 2015 MRI view of Scott's low back and a 2015 MRI report of Scott's cervical spine. The anatomical defects are patent and severe. The significant clinical findings in Dr. Bradley's progress note correlate to the MRI images. These films were taken *before Scott's April 2016 motor vehicle crash*. That crash significantly worsened his symptoms.

An individual's sense of the physiological condition of the physical body is directly associated with emotional well-being and stress levels. Pain acts as a survival signal for the brain: it signals the brain to prepare for fight or flight. In response, the brain changes physically and chemically. This is coupled with changes in the body like increased heart rate, prioritization of blood flow to the muscles, and other stress responses. While the body usually resolves these changes and returns to normal after temporary pain, chronic pain presents a different issue.

Chronic, persistent pain prolongs these systemic and chemical brain changes, leading to real psychological changes. Over time, these can impact brain function, resulting in changes in behavior. Chronic pain state can trigger changes in psychological or mental functions that manifest as alterations in perception, attention, mood, motivation, learning and memory. Chronic pain affects brain regions involved in cognition. Cognition includes awareness, perception, reasoning, decision-making, and judgment. Succinctly, the responsive chemical and physical changes of the brain can have serious impacts on specific functions of the brain. This deeply affects

the mental health of chronic pain patients. See the studies here: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3944001/

Scott's Pelvic Floor Disorder is debilitating. Scott's PFD has been especially damaging to Scott. The "pelvic floor" refers to a group of muscles that stretch from the pubic bone in the front to the tailbone in the back. These muscles play a key role in the maintenance of sexual function and pelvic organ support, acting as a hammock to hold the prostate, bladder, and bowel. The hallmark of PFD is persistent and disabling pain. It can cause a wide range of symptoms including severe pain, erectile dysfunction and urinary and bowel problems - that patients often find difficult to cope with, they can have a deleterious effect on an individual's psychological well-being. Affected men are more likely to develop allergies, fibromyalgia, chronic fatigue syndrome, irritable bowel syndrome and anxiety disorders such as panic attacks and obsessive-compulsive disorder. Persistent and recurrent pelvic pain can significantly reduce quality of life, causing disturbed sleep, fatigue, withdrawal, social isolation, shame, anger and depression, and, in some cases, suicidal feelings. See the professional literature here: https://www.nursingtimes.net/clinical-archive/pain-management/chronic-pelvic-pain-and-prostatitis-symptoms-diagnosis-and-treatment-18-04-2017/.   Indeed, a number of studies have reported that men with PFD experience an impaired quality of life comparable to that of people with diabetes mellitus and congestive heart failure. It has also been reported that higher symptom severity, pain intensity and depressive symptoms are

associated with a worse quality of life.

There is no cure for PFD. However, men experience an ongoing struggle to cope due to a variety of factors including being overwhelmed, feeling unable to talk about it because of 'being a man,' and the constant search for a cure. https://www.thepelvicpainclinic.co.uk/the-psychological-impact-of-chronic-pelvic-pain-syndrome/
The excerpts from the articles describe Scott's experience with PFD in all major respects. It led to the end of Scott's 8-year relationship with his fiancé, Gretchen Smalley. It took years to diagnose due to his comorbid serious back injury. The extent of the physical and psychological toll is not easily expressed. As will be set forth later, Scott continues to use accepted modalities. Scott has utilized as used intrusive massage of the prostate, counseling, diet, and other approaches intended to reduce the number and severity of episodes. However, his episodes, while always lurking, are improved but can be debilitating.

His prescription pain medication and benzodiazepines to Subutex/Suboxone. Given Scott's severe and progressively worsening physical injuries, associated conditions, and failed interventions such as multiple epidural injections, his use of opioid pain medication over the years was almost understandable. What stands out from medical reports Scott has submitted, is that while he struggled with addiction to the medications, before his arrest he had his doctors put him on Subutex.

The Scott Carper who was arrested in this case was a very sick and addicted person; and that is a tremendous understatement. As this Court knows well, drug addiction is also a relevant consideration for a downward departure. *US v Garcia* 497 F. 3d 964, 971-72 (9th Circuit 2007)

Then, Scott suffered so much more immediately when arrested in 2020. Scott was forced to go "cold turkey detox" from benzodiazepines and opiates while chained to a bed for 14 days. The withdrawal symptoms are physically and emotionally painful, and can even be life-threatening if the user stops "cold turkey." Those with a history of taking higher doses or taking the substance for a prolonged time have the worst withdrawal symptoms. Withdrawals symptoms usually last 10-15 days and include heart palpitations, hand tremors, hallucinations, seizures, psychosis or psychotic reactions. It is a very, very difficult process and can have long term trauma implanted in to the person.

<u>Scott's Amazing Post Offense Rehabilitation</u>. As the PSR reports, at arrest, Scott, who is 6'0 tall, weighed close to 380 pounds and suffered a very severe disease of addiction to opiates; the worst addiction that there is. Scott now presents **under 200 pounds.**

After his arrest Scott immediately changed his life. What is very important is a June 20, 2022 report from SoCal Behavioral Medicine where Scott has been successfully receiving treatment since March 5, 2020, one month after his arrest. It is essential to consider this information.

14

To combat his addiction here are some of the many steps he has taken to combat his addiction.

* Meeting (zoom & in person) AA meeting twice a month
* Continued exercise (6 races. 5/10K) lost over 170lbs
* Pretrial therapy was given for around 6 months. He worked with a therapist 2X a month. They deemed it completed and it ended.
* Physical therapy minimum 2x a month

It is a completely different Scott who now appears before the Court for sentencing, a person "decades" different in their journey in life. Of importance, a sentence loses its deterrent effect when the punishment happens *so far removed from the date of the offense*. It is a well known maxim. (See Listokin, Yair, "*Crime and (with a lag) Punishment: Equitable Sentencing and the Implications of*" (2007). Faculty Scholarship Series. Paper 552. http://digitalcommons.law.yale.edu/fss_papers/552 (appropriate to discount sentencing terms by adjusting individual sanctions to account for the lag between crime and punishment.) Here, the 2 and ½ years is not necessarily the longest time in months and years, but in the development and creation of the outstanding person that Scott is currently, it is a decades ago Scott who committed the crime.

What will be provided shortly to this Court is Scott's letter. It will provide the Court with the entirety of the story of Scott in this case.

The outstanding and extensive letters of support, describing in detail every aspect of who the real Scott Carper is and how he should be viewed by this Court, by those who know him the very best, weigh so heavily as a factor in the case. Without dispute, these letters themselves remove Scott from the "heartland" of any sentence as contemplated by the upward departure discussed in the PSR.

## CONCLUSION

A sentence in the range of 0-6 months is the only legally appropriate sentence.

DATED: August 19, 2022

                        Respectfully submitted

                        *Mark Reichel*

                        MARK REICHEL
                        Attorney For Defendant