RANDY S. GROSSMAN
United States Attorney
BLAIR C. PEREZ
PATRICK C. SWAN
Assistant U.S. Attorneys
California Bar Nos. 166155/306526
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7963/8450
Email: blair.perez@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SCOTT DONALD CARPER,<br><br>Defendant. | Case No. 20CR0834-CAB<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Date: August 26, 2022<br>Time: 9:30 a.m.<br><br>The Honorable Cathy Ann Bencivengo |

COMES NOW the plaintiff, United States of America, by and through its counsel, Randy S. Grossman, United States Attorney, and Blair C. Perez and Patrick C. Swan, Assistant United States Attorneys, and hereby files its Sentencing Memorandum, in the above-captioned case. The United States' final recommendation in this case is **36 months**.

//
//
//
//
//

## I.  Statement of Facts

Defendant was arrested and charged with importing more than 100 pounds of methamphetamine concealed in quarter panels and non-factory compartments in the Dodge Ram pickup truck Defendant drove into the San Ysidro Port of Entry on February 4, 2020.  Defendant entered a guilty plea to making a false official statement to Customs and Border Protection officers at the San Ysidro Port of Entry on February 4, 2020.  The PSR provides a detailed description of the entirety of Defendant's offense conduct, including a summary of Defendant's testimony at his trial for importation of methamphetamine.  [PSR at 4-6.]

Defendant denied knowledge of the drugs concealed in his vehicle, but as outlined in the PSR, admitted under oath that he met the owner of the Dodge Ram, Carlos, at a Cannabis trade convention where Defendant's company was trying to locate potential investment opportunities in real estate for dispensaries, grows or distillate factories, as well as trying to broker deals between dispensaries, farms, and clients. [PSR at 5, ¶ 12.] When Carlos was hospitalized following a car accident, Defendant visited him and shared Defendant was taking pain medication for constant pain.  [PSR at 5, ¶ 13.]  Carlos told Defendant he had a good friend and marijuana farm boss who could obtain pain medication for Defendant.  Defendant met the friend, Oscar, who said he could get a few hundred pain pills for Defendant for approximately $100 through a relative who was a medical professional in Rosarito, Mexico.  [Id. at 5, ¶¶ 13-14.]  Oscar suggested Defendant drive Carlos's Dodge Ram truck rather than Defendant's Lexus to Rosarito to pick up the pain pills. [Id.] On January 27, 2020, Defendant drove the truck from Los Angeles to a Rosarito Walmart to meet Oscar.  [Id. at 5-6, ¶ 16.]  Oscar was late, said he had to use Defendant's truck to take care of some other things, then would return with the pain medication. [Id.]  Defendant waited at a nearby hotel lobby for several hours. [Id.]  Oscar returned with just 30 pills of Tramadol, not the agreed upon Vicodin or Oxycontin. [Id.] Defendant drove back to Los Angeles a little frustrated.[Id.]  On February 4, 2020, Defendant repeated the evolution over again.  Defendant drove Carlos's truck from Los

2

Angeles to Rosarito, turned the truck over to Oscar, and waited several hours at a hotel for Oscar to return. [Id. at 6, ¶ 17.] Oscar returned again with Tramadol pills, but no Vicodin or Oxycontin. [Id.] Defendant drove the truck to the Port of Entry to return to Los Angeles, where he lied to officers at the Primary Booth that he acquired Tramadol in Mexico for his mother. Defendant was subsequently arrested when 100 pounds of methamphetamine were seized from compartments in the truck. Defendant's trial testimony simply was not credible.

Additional pertinent facts revealed during the trial include Defendant's admission of his addiction to pain killers; Defendant thought driving to Rosarito to acquire prescription pain medication from an unknown source in Mexico was safer than acquiring it from an on-line network of other pain killer users; Defendant had a history of car accidents and had trouble following driving directions; Defendant's first time driving in Mexico was the January 27, 2020 crossing; Oscar lived in San Diego and worked in Southern and Northern California; Defendant did more than broker marijuana transactions, he delivered large quantities of marijuana, he picked up tens of thousands of dollars in cash from marijuana purchasers, and he conducted his marijuana business over text and cell phone without concern for whether his clients were licensed dispensaries or growers; and Defendant owed the IRS approximately $130,000 at the time of his arrest. Moreover, some of the methamphetamine was concealed in sophisticated, non-factory compartments built into the truck cab and the retail value of methamphetamine was in excess of $700,000.

## II.     Argument

### A.     Guidelines Calculation

Defendant pled guilty to making a false official statement in violation of 18 U.S.C. § 1001. Pursuant to the Plea Agreement (ECF 107 at 8), the parties agree to recommend the following Guidelines calculation:

| | |
|---|---|
| Base Offense Level [USSG §2B1.1(a)(2)] | 6 |
| <u>Acceptance of Responsibility [USSG §3E1.1]</u> | <u>-2</u> |
| Adjusted Offense Level | 4 |

The Plea Agreement also permits the United States to argue the applicability of an upward departure for Dismissed/Uncharged Conduct under USSG § 5K2.21 [ECF 107 at 8:16-17.] The United States seeks a 15-level upward departure, as explained below, for a final adjusted offense level calculation as follows:

Departures:

<u>Dismissed/Uncharged Conduct [USSG § 5K2.21]</u>              +15

Total Adjusted Offense Level                                                    19

Defendant has two Criminal History points and a Criminal History category of II [PSR at 9.]   An Adjusted Offense Level of 19 and a Criminal History Category II results in a Guideline Range of 33-41 months.  The United States seeks a mid-range sentence of 36 months.

### B.     Uncharged/Dismissed Conduct Proven Beyond a Reasonable Doubt

Pursuant to USSG §5K2.21, the Court may "depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as a part of a plea agreement in the case…; and (2) that did not enter into the determination of the applicable guideline range."  The United States asks the Court to depart upward 15 levels to reflect the seriousness of Defendant's false official statement, which was made to prevent the discovery of approximately 100 pounds of methamphetamine concealed in Defendant's vehicle.  The close connection between the false statement and the importation offense is established beyond a reasonable doubt by the facts and terms of the Plea Agreement, as well as by evidence and testimony presented at trial.

1. <u>Plea Agreement</u>

Pursuant to the factual basis of Defendant's Plea Agreement, the following facts are true and undisputed:

> 1.) Defendant entered the United States from Mexico at the San Ysidro Port of Entry on or about February 4, 2020.  (Plea Agreement, ECF 107 at 3.)
>
> 2.) Defendant was the driver and sole occupant of a Dodge Ram. (Id.)
>
> 3.) When asked by a Customs and Border Protection Officer why he had gone to Mexico, Defendant responded that he had gone to Mexico in

order to purchase Tramadol for his mother. (Id. at 4.) That statement was false.

4.) At the time that Defendant made it, Defendant knew the statement was "materially false, fictitious, and fraudulent" because the Tramadol was not for his mother, but for himself. (Id.)

5.) Defendant "**made the statement to reduce the likelihood of being referred to secondary.**" (Id., emphasis added.)

6.) Defendant's false statement "had a natural tendency to influence, or was capable of influencing [Customs and Border Protection Officers with the Department of Homeland Security] decisions or activities **to allow Defendant to enter the U.S. without further inspection.**" (Id., emphasis added.)

7.) At secondary inspection, 47.88 kilograms (105.34 pounds) of methamphetamine, a Schedule II controlled substance, was discovered concealed in Defendant's Dodge Ram. (Id.)

Based on the factual basis of the Plea Agreement, Defendant concedes that the motive for the false statement was to avoid a referral to the secondary inspection lot, and, more precisely, to enter the United States without further inspection. Defendant also concedes that upon a secondary inspection, more than 100 pounds of methamphetamine were discovered concealed in his vehicle. In sum, Defendant lied to the Primary Officer to avoid discovery of the drugs he was importing at that moment. The lie and the importation are substantially linked, both substantively and temporally.

2. Trial Evidence and Testimony

The 15-level upward departure and guideline range of 31-37 months recommended by the United States is a significant departure from the adjusted offense level of 4 and guideline range of 0-6 months recommended by Defendant. In this case, the United States has the benefit of all of the evidence and testimony presented at trial on which to rely at sentencing. The Court presided over the trial and is personally familiar with the facts presented through testimony and evidence. Based on those facts, Defendant's importation

of methamphetamine has been proven by more than a preponderance of the evidence and/or clear and convincing evidence; it has been proven beyond a reasonable doubt.[1]

During the three day trial, the United States introduced approximately 50 Government Exhibits and four stipulations, and presented testimony from six Government witnesses. The admitted evidence included photographs of the San Ysidro Port of Entry, the Dodge Ram pickup truck Defendant drove into the Port of Entry, Z-Portal images, the quarter panel and non-factory compartments in the cab of the pickup truck, the packages of methamphetamine located in the compartments, and the packages of methamphetamine on the scale at the Port of Entry. [Government Trial Exhibits 1 through 25.] Testimony was introduced by the Customs and Border Protection Officers who received Defendant's false statement at the Primary inspection area and who encountered Defendant as he drove the Dodge Ram pickup truck from the Primary Inspection booth to the Secondary Inspection area and through the Z-Portal x-ray machine. Additionally, the parties entered four stipulations including those allowing the introduction of the seized methamphetamine, the TECS crossing photos of Defendant crossing before and on the date of arrest, and Defendant's mother's testimony that she did not use Tramadol or ask Defendant to acquire it for her. The United States introduced testimony from Mr. Ken Davis, a vehicle expert who testified, in part, that some of the compartments inside the cab of the pickup truck were sophisticated non-factory and made aftermarket. [Government Trial Exhibits 40 through 45.] SA Andrew Flood, an expert on drug values in the region, testified, in part, that the methamphetamine seized from Defendant's pickup truck had a retail value of $718,290. The United States also admitted an IRS tax notice addressed to Defendant found on the pickup truck's passenger seat with Defendant's belongings that notified Defendant that he owed a tax debt of $130,725 due on February 12, 2020, approximately eight days after Defendant's attempted importation. [Government Trial Exhibit 31.] In all, the evidence and testimony presented by the United States during its case-in-chief established

---

[1] The United States is relying only on the evidence and testimony presented at trial as recalled by the Court and/or discussed herein to meet its burden of proof that Defendant committed the importation offense. It is not relying on the jury verdict of guilt.

beyond a reasonable doubt the elements of a violation of 21 U.S.C. § 952 and 960. Specifically, Defendant knowingly brought methamphetamine into the United States from a place outside the United States; and Defendant knew the substance he was bringing into the United States was methamphetamine or some other federally controlled substance.

Defendant did not give a post-arrest statement, but he testified under oath at trial. The entirety of Defendant's trial testimony begins on page 24 of a 98 page transcript. (See Defendant's Trial Transcript attached as Exhibit 1.)[2] Although comprising more than 70 pages, nearly every page contains information that is pertinent to Defendant's sentencing factors under the Sentencing Guidelines or 18 U.S.C. §3553(a). To the extent there was any doubt that Defendant knew he was importing a federally controlled substance before Defendant took the stand, those doubts were gone by the time Defendant was excused as a witness. In addition to the summary provided in the PSR, the United States identifies the following excerpts from Defendant's trial testimony as non-exhaustive examples of relevant evidence of Defendant's guilt:

    1.)    <u>False Official Statement</u>:

Q: Ms. Williams – "What else did you say about [the Tramadol] to the agents?"

A: Defendant – "I screwed up. I lied. I said that the Tramadol was for my mom." [Exhibit 1 at 51:9-10.]

    2.)    <u>Defendant's illegal activity as a marijuana trafficker</u>:

Q: Ms. Perez – "Your part of it, introducing [marijuana farmers] to, I guess, the customers, trying to broker that relationship, that facilitation was a violation of federal drug trafficking laws, agreed."

A: Defendant – "Yes." [Exhibit 1 at 61:6-10.]

    \*    \*    \*    \*

---

[2] The first 24 pages transcribe the testimony of a different witness and are not included.

Q: Ms. Perez – "…Isn't it true you were also personally delivering large pound quantities of marijuana?"

A: Defendant – "Yes." [Exhibit 1 at 62:8-11.]

    \*    \*    \*    \*

Q: Ms. Perez – "Is it fair to say you yourself personally were moving marijuana in suitcases for delivery?"

A: Defendant – "I suppose, yeah, I did that." [Exhibit 1 at 62:24-63:1.]

    \*    \*    \*    \*

Q: Ms. Perez – "Did you also collect money, pick up proceeds in connection with the marijuana distribution?"

A: Defendant – " Yes…[t]hat happened on occasion but it wasn't the norm. "

Q: Ms. Perez –"But on the occasions you did that, that required you then to physically transport what, large amounts of cash?"

A: Defendant – "Once in a blue moon."

Q: Ms. Perez – "But the answer to my question is 'yes'?"

A: Defendant – "Yes."

Q: Ms. Perez – "…You would transport large amounts of cash?"

A: Defendant – "Yes."

Q: Ms. Perez – "Is that accurate?"

A: Defendant – "Yes." [Exhibit 1 at 63:20 – 64:11.]

    \*    \*    \*    \*

Q: Ms. Perez – "You're the one who has the UCSB college graduation, and, you know, the business that you described as a media marketing person. No concern about making sure the people that you're working with were, in fact, legally permitted to participate under state law in the distribution of marijuana?"

A: Defendant – "No." [Exhibit 1 at 65:7-12.]

    \*    \*    \*    \*

Q: Ms. Perez – "So in this particular transaction, this is a transaction for $30,000 worth of marijuana?"

A: Defendant – "Correct."

Q: Ms. Perez – "And then what is it that you say in ----you wrote in your text message below that calculation?"

A: Defendant: "`*Cool. I'll meet with your boy and see you later to pick up the G4'*, which is a different type of [marijuana] strain*.*"

Q: Ms. Perez – "And there's a dollar sign behind that; is that correct?"

A: Defendant – "Correct."

Q: Ms. Perez – "What's the dollar sign mean?"

A: Defendant – "I don't know in this particular instance. I assume it means money." [Exhibit 1 at 69:6-18.]

3.) <u>Defendant's False Testimony About His Marijuana Business Partner</u>

Q: Ms. Perez – "Well, let's go back to the other question I had. Are you working with somebody in your role as a [marijuana] broker? Do you have a partner?"

A: Defendant – "No." [Exhibit 1 at 76:2-5.]

    \*      \*      \*      \*

Q: Mr. Swan – "And, you know, it came up yesterday, the term 'we'. Did the defendant have a business partner in terms of what he was doing in the Cannabis industry?

A: Mr. Donald Carper[3] - "Yes."

Q: Mr. Swan – "Who was that?"

A: Mr. Donald Carper – "I believe his name was Matt."

Q: Mr. Swan – "So the defendant did have a business partner with this marijuana Cannabis industry he was working on?"

---

[3] Defendant called his father, Mr. Donald Carper to testify on his behalf. Mr. Donald Carper's trial testimony is comprised of 24 pages and is attached as Exhibit 2.

A: Mr. Donald Carper – "I believe he did."

Q: Mr. Swan – "Okay. And how do you know that?"

A: Mr. Donald Carper – "Again, general discussions with [the defendant]."

Q: Mr. Swan: "The defendant told you that, correct?"

A: Mr. Donald Carper – "Yes…" [Exhibit 2 at 18:10- 22.]

Defendant's testimony denying he had a marijuana business partner is contradicted by his father. Mr. Carper even offered a name for the business partner: Matt. Thus, while testifying under oath, Defendant withheld information about a co-conspirator in his marijuana trafficking business. The United States can speculate as to why, but the most obvious conclusion is Defendant was protecting his co-conspirator from law enforcement scrutiny and likely protecting himself from the discovery of a witness who could incriminate him in the charged offense.

The facts presented at trial established that Defendant was an addict, working as a marijuana trafficker, hoping to expand a marijuana business that he shared with a partner whose existence he denied under oath. Defendant admitted he was intent on networking with other marijuana traffickers such as Oscar. This same Defendant, who testified about a string of serious and debilitating car accidents throughout his life and whose father testified was directionally challenged, elected to drive from Los Angeles and into Mexico for the very first time at night in an unfamiliar vehicle that happened to contain sophisticated non-factory compartments, just in hopes of obtaining a couple hundred Vicodin or Oxycontin for a $100. And, to stretch the credibility of this tale even further, Defendant testified that driving to Mexico to acquire the pain pills from an unknown Mexican source affiliated with marijuana trafficker Oscar was safer and more reliable than using his on-line network of pain med users. Even after Oscar stranded Defendant at a Rosarito hotel for hours and failed to deliver the pills on January 27, 2020, proving to be very unreliable, Defendant testified he returned to Mexico on February 4th a second time – again, just to acquire a couple hundred pain pills. Of note, Oscar traveled between

Rosarito and San Diego all the time, yet Defendant did not insist on picking up the pain meds from Oscar in San Diego. Why was Defendant so amenable to driving to Rosarito under these circumstances? The evidence shows he went to participate in the importation of a federally controlled substance because it allowed him to develop business ties with a significant marijuana grower and a potential Mexican source of supply. He also had an immediate need for money due to the IRS tax bill. Overall, a 15-level upward departure is a modest increase to account for Defendant's offense conduct.[4]

### C. The Factors under 18 U.S.C. § 3553(a) Support a Sentence of 36 Months

Pursuant to 18 U.S.C. § 3553(a), the court shall impose a sentence "sufficient but not greater than necessary" to comply with the purposes of sentencing, which include providing just punishment that reflects the seriousness of the offense, affording adequate deterrence to criminal conduct, protecting the public from further crimes of the defendant, and effectively providing the defendant with needed training, medical care, or other correctional treatment. The court is also instructed to consider "the nature and circumstances of the offense and the history and characteristics of the defendant" in addition to the above-referenced purposes of sentencing.

The nature and circumstances of the offense have been addressed in detail above. The PSR also addresses the history and characteristics of Defendant. Two such characteristics in particular necessitate the 36 month sentence: Defendant's Criminal History and Defendant's Addiction History.

#### 1. Criminal History

The PSR identified three arrests and convictions for Defendant, totaling two criminal history points and a Criminal History Category of II. [PSR at 8-9.] The United States directs the Court's attention to the following: 1) at least two of the incidents involved possession of cocaine; and 2) Defendant's charges resulted in dismissal following a

---

[4] Notably, the PSR recommends a 19-level upward departure for the same dismissed conduct. [PSR at 22.]

completed diversion program or were reduced to misdemeanors with probationary sentences. The last two incidents, dated in 2012 and 2014, involved DUI charges that were pled down to reckless driving.

The PSR describes Defendant's 2007 charges as resulting from his self-reported cocaine induced paranoia following "five lines of cocaine". [PSR at 9.] Defendant also reported he took Xanax and Subitex. [Id.] The officers described Defendant's apartment as "ransacked with swords and knives strewn all around the living room," "a DVD case in the bathroom covered in cocaine," and "two plastic baggies of cocaine at the corner of the throw rug in the living room." [Id.]

The PSR includes a brief description of Defendant's arrest and charges in 2012. According to the PSR, Defendant collided with three parked cars while under the influence. A search of the vehicle resulted in the discovery of a small baggie of cocaine. [PSR at 9.]

The United States produced the police report from the 2014 arrest to Defendant in Discovery at Bates #528-545. The report also details an incident wherein Defendant collided with parked cars while under the influence.[5] According to the report, officers noted Defendant's speech was heavily slurred and his gait was unsteady. Defendant told officers he took Valium and Xanax as needed. Defendant consented to a search of his car, during which they found a plastic baggy containing a white powdery substance on the floor near the brake pedal. When asked what it was, Defendant replied, "I assume its cocaine." Defendant denied it was his cocaine, but admitted to snorting a line of cocaine about six hours prior to the accident. During an inventory search of the vehicle, officers found a second baggy of what appeared to be cocaine inside a Giants hat (matching Defendant's t-shirt) on the passenger seat of the vehicle.

Defendant's criminal history indicates abuse of cocaine that extended at least from 2007 to 2014, not just abuse of prescription pain killers. His criminal history also indicates an increasing escalation in the seriousness of his offenses. In 2007, Defendant was

---

[5] The United States believes that the incident described in the PSR as the 2012 arrest is actually based on the police report from the 2014 arrest.

charged with possession of cocaine after calling police to his home. In 2014, Defendant was charged with possession of a controlled substance and DUI after he crashed his vehicle into three parked cars while under the influence and in the possession of cocaine. In 2020, Defendant was arrested and charged in the instant case with importation of methamphetamine while under the influence of controlled substances. After each previous incident he avoided serious consequences. Empirically, sentencing Defendant to probation will not serve to deter Defendant. It definitely will not adequately address the seriousness of his offense.

### 2. Addiction History

Defendant has been very open about his addiction to prescription pain killers. He testified about it at length during trial, particularly how it started from injuries sustained in a serious car accident following high school and persisted over the years as he suffered significant physical setbacks and new injuries. He shared details of the nature and reasons for his prescription drug abuse during his interview with the Probation Officer. [PSR at 13.] Defendant was also diagnosed with depression and anxiety in his early 30s and was taking Xanax, Buspar and Seroquel to treat the conditions at the time he met with the Probation Officer on February 16, 2022. [PSR at 6, 12.] Defendant provided the United States and the Court with a letter in which he described the steps he has taken in recovery following his arrest in the instant case. [Defendant's Letter, ECF 123.] Defendant has not tested positive for drugs in over 20 drug tests while on bond. He has lost more than 170 pounds after embarking on a daily diet and physical fitness regimen. He has met with an addiction specialist in Los Angeles every month and attended support groups on-line and in person, specifically AA. He reports that his meetings with a court appointed counselor ended after six months as a result of the counselor deeming them no longer necessary. He also shared his goals for the future, to include continuing to prove to others that "I have learned to live with my existing injuries and can responsibly use medication as prescribed." [Defendant's Letter, ECF 123 at 3.]

The United States commends Defendant's obvious and very apparent achievements in regaining his physical and mental health since February 4, 2020. But the United States

recommends a 36 month sentence, in part, because of what is absent from Defendant's discussion of his drug addiction and recovery. For this Court, sentencing a defendant who is an addict is a very common occurrence. Like the Court, the undersigned has participated in the sentencings of hundreds of addicts. And, like the Court, the undersigned is familiar with relapse being a part of recovery as many, many sentenced addicts return to court having relapsed while on supervised release. Defendants who are addicts who succeed on supervised release and maintain their recovery have one attribute in common: honesty. An addict in true recovery learns to evaluate their actions with a cold, steely honesty and brutal self-awareness. Recovery programs require them to hold themselves accountable for every decision they make and every consequence that befalls them. They learn to change their thinking and to stop viewing themselves as victims of circumstance. When an addict minimizes or justifies his drug use, it's the surest sign that his recovery is in peril.

Based on this extensive experience, Defendant's statements and acts do not give the undersigned confidence that Defendant has truly addressed his addiction. Defendant has failed to address his criminal history, his history of cocaine abuse in addition to opioid abuse, his cocaine abuse's ties to his escalating criminal conduct, his numerous car accidents, his extremely poor choice in trying to enter the Cannabis industry as an addict, the full extent of his unlawful conduct trafficking marijuana, the illegal and dangerous practice of seeking prescription drugs on-line from non-providers, his inability to maintain financial independence from his parents as a highly educated 46-year old, his increasing tax debt to the IRS, his failing consulting business, his lack of candor with his family and friends for years about the chaotic state of his existence, and the list goes on. Defendant has utterly failed to address any of the "bad" facts of his life that cannot be explained away as a result of an addiction to prescription pain pills for which he holds no responsibility.

Defendant's recitation of his achievements in recovery are very positive. However, the actual recovery treatment itself is underwhelming for a 46-year old man with a 20+ year addiction to opioids arrested for importing more than 100 pounds of methamphetamine. Essentially, Defendant has met remotely once a month with an addiction specialist and attended some AA meetings. Clearly, he has complied with the

terms of his release and is not using drugs. But new habits of diet and exercise, while important, will not serve as a "treatment plan" for maintaining sobriety. Defendant is not attending daily or bi-weekly AA meetings, does not have a sponsor, and is not working a 12-step program. Defendant has attended rehab in the past. He has had periods of sobriety. And then relapses. What is different now?

### D.      Conclusion

The parties arrive at this sentencing hearing following an unconventional procedural history. On October 20, 2021, Defendant was convicted by jury trial of importing more than 100 pounds of methamphetamine in violation of 21 U.S.C. §§ 952 and 960. Despite the conviction, the United States elected to allow Defendant to plead guilty to the lesser offense of making a false official statement to the Primary Officer at the time of his importation and to dismiss the charge of importation of methamphetamine for two reasons: 1) to allow finality to the case, and 2) the terms of the plea agreement are very favorable to the United States. As with any post-trial sentencing agreement, the plea agreement allowed the case to be resolved without further litigation. However, finality would not have been a sufficient reason to enter the plea if the plea did not satisfy the United States' commitment to enforcing federal law and holding violators accountable. Here, the United States' is permitted to seek an upward departure of up to 60 months for the Uncharged/Dismissed Conduct of importation, which is the statutory maximum for a violation of 18 U.S.C. § 1001. [ECF 107 at 9:17-19]. Although Defendant faced a 10-year mandatory minimum sentence based on his conviction at trial, he would not have received that sentence nor would the United States have sought it. The United States is seeking the sentence here that is nearly the equivalent of what it would have sought post-trial. In the end, although Defendant avoids a federal drug conviction, he can still be held accountable for the dismissed drug offense that the United States argues is inextricably intertwined with his false statement.

//

//

For the foregoing reasons, the United States requests that the Court sentence defendant to 36 months' custody and 3 years of supervised release.

DATED: August 25, 2022.  Respectfully submitted,

RANDY S. GROSSMAN
United States Attorney

*s/ Blair C. Perez*
BLAIR C. PEREZ
Assistant U.S. Attorney